UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

DoseLogix, LLC,                                      File No. 21-cv-1275 (ECT/DJF)

        Plaintiff and
        Counter-Defendant,

                                     **OPINION AND ORDER**

v.

Reflex Medical Corp.,

        Defendant and
        Counter-Claimant.

---

Michael J. Bradford, Luedeka Neely Group, P.C., Knoxville, TN, and John M. Weyrauch and Peter R. Forrest, Dicke, Billig & Czaja PLLC, Minneapolis, MN, for Plaintiff and Counter-Defendant DoseLogix, LLC.

Casey Allen Kniser, Law Office of Casey A. Kniser LLC, Chicago, IL, and Douglas J. Christensen, Christensen, Fonder, Dardi & Herbert PLLC, Maple Grove, MN, for Defendant and Counter-Claimant Reflex Medical Corp.

---

Plaintiff DoseLogix, LLC, owns two patents directed to dosing dispensers for flowable compositions. *See* U.S. Patent Nos. 10,919,685 B2 (the "'685 Patent") and 10,947,027 B2 (the "'027 Patent") (the "patents-in-suit"). Defendant Reflex Medical Corp. makes, uses, offers for sale, sells, and/or imports medical dosing dispensers, including the UnoDose™ Metered-Dose Topical Applicator, in the United States through its UnoDose division. Compl. [ECF No. 1] ¶¶ 6, 16. DoseLogix believes that Reflex's activities infringe one or more claims of the patents-in-suit. Compl. ¶¶ 47–62.

I

A

The Parties seek construction of numerous claim terms in DoseLogix's patents. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996); ECF No. 56. The Parties initially agreed on the construction of two claim terms and sought construction of fourteen claim terms in DoseLogix's patents. Then, the Parties agreed on the construction of six additional terms during the course of briefing and oral argument.[1] Those agreed-upon constructions, as shown in the following table, will be adopted.

| Agreed Constructions | | |
|---|---|---|
| Phrase | Patent Claim(s) | Construction |
| "arm extends radially outwards" | '685 Patent, Claim 7 | *Arm extends outwardly and away from the center of the driver.* |
| "outer perimeter" | '027 Patent, Claim 6 | *The outer boundary of an object when viewed in two dimensions.* |
| "arms including an engagement end configured to engage one of a plurality of slots" | '027 Patent, Claim 7 | *No construction.* |
| "a plunger . . . engageable with the traveler" | '027 Patent, Claims 1, 12 | *A plunger capable of engagement with a separate traveler.* |

---

[1] The Parties agreed to the construction of the terms "arm extends radially outwards" and "outer perimeter" prior to *Markman* briefing. *See* ECF No. 56 at 2. During briefing, the Parties agreed that construction of the term "arms including an engagement end configured to engage one of a plurality of slots" was unnecessary. *See* ECF No. 61 at 15. Then, during the *Markman* hearing, the Parties agreed on constructions of the following five additional terms: "a plunger . . . engageable with the traveler"; "first end of the traveler is configured to engage the plunger within the plunger cavity"; "projection"; "clicking profile"; and "cam."

| "first end of the traveler is configured to engage the plunger within the plunger cavity" | '027 Patent, Claim 3 | *A first end of a traveler is configured to engage with a separate plunger.* |
|---|---|---|
| "projection" | '685 Patent, Claim 12 | *No construction.* |
| "clicking profile" | '685 Patent, Claim 12 | *A profile that creates a click when the arm returns to an unbent position from a bent position.* |
| "cam" | '027 Patent, Claim 7 | *A rotating component of a mechanism used in transmitting motion.* |

Eight claim terms remain in dispute. As described in more detail below, those terms

will be construed as follows:

| Construction of Disputed Terms | | |
|---|---|---|
| **Phrase** | **Patent Claim(s)** | **Construction** |
| "dosing dispenser" | '027 Patent, Claims 1, 3–8, 12; '685 Patent, Claims 7, 12 | *No construction.* |
| "flowable composition" | '027 Patent, Claims 1, 4, 5; '685 Patent, Claim 7 | *No construction.* |
| "driver" | '027 Patent, Claims 1, 7, 12; '685 Patent, Claim 7 | *No construction.* |
| "traveler" | '027 Patent, Claims 1, 3, 4, 12; '685 Patent, Claim 7 | *No construction.* |
| "traveler is retained within the chamber when the dosing dispenser is assembled such that the first end and second end are within the chamber" | '027 Patent, Claims 1, 12 | *No construction.* |
| "anti-back rotation assembly" | '027 Patent, Claim 1 | *Parts that are operable to resist backward rotation.* |
| "traveler is configured to selectively position the plunger at a predetermined location . . . so as to dispense a predetermined | '027 Patent, Claim 1 | *No construction.* |

| quantity of a flowable composition" | | |
|---|---|---|
| "arm extends . . . from an arm location proximate the driver" | '685 Patent, Claim 7 | *The arm extends . . . from an arm location near or close to the driver.* |

B

Two motions require resolution up front, as the outcome of these motions will determine the relevant range of evidence and argument considered in this claim construction. Each Party requests leave to file a reply to its opponent's responsive *Markman* briefing, *see* ECF Nos. 64, 67, to address evidence or arguments raised for the first time in the response brief, but not disclosed in the Parties' Joint Claim Construction Statement, ECF No. 56. First, DoseLogix asks to reply to Reflex's argument that the "driver" and "traveler" claim limitations are means-plus-function limitations under 35 U.S.C. § 112(f). These arguments were first raised in Reflex's Response *Markman* Brief, and they were not included in the Joint Claim Construction Statement. *See* ECF No. 65; *see also* ECF No. 56 at 4–5. DoseLogix does not seek to strike or exclude these arguments—it just wants to respond. Reflex, on the other hand, asks the Court not to consider the Guebert Declaration, ECF No. 62, filed along with DoseLogix's response brief. *See* ECF No. 67. Like Reflex's means-plus-function arguments, the Guebert Declaration was not disclosed in the Joint Claim Construction Statement, and DoseLogix first raised it in the responsive *Markman* Brief. *See* ECF No. 67-1. Each Party argues that these briefs will aid the Court in the disposition of the claim construction. *See, e.g., Fond*

*du Lac Band of Lake Superior Chippewa v. Stepp*, No. 19-cv-2489 (PJS/LIB), 2020 WL 6262374, at *2 (D. Minn. Jan. 30, 2020) (allowing reply on non-dispositive motion).

Because the evidence or argument that was not identified in the Joint Claim Construction Statement will not be considered, the Parties' requests for leave to file reply motions to briefing that addresses such evidence or argument will be denied as moot. The Pretrial Case Management Order states that the Joint Claim Construction Statement, due on June 13, 2022, "must include . . . each party's proposed construction of each disputed claim term, phrase, or clause together with an identification of all references from the specification of [sic] prosecution history to support that construction, and an identification of any extrinsic evidence known to the party on which it intends to rely either in support of its proposed construction of the claim or to oppose any other party's proposed construction." *See* ECF No. 38 [Pretrial Case Management Order (Patent)] at 5.a.iv.; *see also* ECF No. 29 [Rule 26(f) Report] at 9, ¶ 6.d. (same). When the Parties filed the Joint Claim Construction Statement, they did not include the evidence and arguments that are the subject of the reply briefs. DoseLogix did not disclose the Guebert Declaration as extrinsic evidence in its construction of the term "driver" in the Joint Claim Construction Statement. *See* ECF No. 56 at 4. And Reflex did not disclose means-plus-function constructions for the terms "driver" and "traveler" in the Joint Claim Construction Statement; it did not even refer to 35 U.S.C. § 112(f). *See id*. at 4–5. This was despite Reflex's attempt to do so for another at-issue claim term. *See* ECF No. 56 at 10 (proposing a means-plus-function "112(6) term" construction of "clicking profile"). Adding additional evidence or a new proposed construction now would require modification of the

Pretrial Case Management Order.  No Party has asked to do so, nor has any Party attempted to show the "good cause" required to modify the schedule to allow for such amendments. *See* ECF No. 38 at 1 & n.1 ("This schedule may be modified only upon formal motion and a showing of good cause . . . .").  Considering that neither Party disclosed these arguments or evidence in the Joint Claim Construction Statement, Reflex's means-plus-function arguments for the "driver" and "traveler" terms, as well as DoseLogix's Guebert Declaration, will not be considered.  Accordingly, the Parties' motions for leave to file reply briefs will be denied as moot.

## II

On to the patents.  The '685 Patent is a continuation of application 15/847,167, which matured into another DoseLogix patent, U.S. Patent No. 10,435,226 (the "'226 Patent").  The '027 Patent is a continuation of application 16/545,956, which in turn is a continuation of application 15/847,167.  All three of these patents claim priority to U.S. Provisional Application 62/439,280, filed on December 27, 2016.  *See* '685 Patent at 1:5–11; '027 Patent at 1:5–14.  The patents-in-suit have different claims, but generally share the same specification and drawings.[2]

The patents-in-suit disclose devices for dispensing flowable compositions.  *See* '685 Patent 1:15–18.  Generally, each patent describes "a dispenser having a base which causes a plunger to urge a predetermined amount of flowable composition through an opening in the dispenser."  *Id*.  As background, the inventions seek to solve the challenge of delivering

---

[2]      Unless otherwise noted, citations to the specification in this opinion will refer to the '685 Patent.

an accurate, measured amount of a compounded, cream-based medicine to a skin surface.
'685 Patent at 1:22–43.

III

The basic standards governing claim construction are easy to recite, if sometimes difficult to apply.  Courts, not juries, construe patent claims.  *Markman*, 517 U.S. at 391.  In general, claim language means whatever it would have meant to a person of ordinary skill in the relevant art at the time the patent application was filed.[3]  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).  Construction is most necessary when a claim uses "technical terms for which the jury may not appreciate an 'ordinary' meaning."  Fed. Judicial Ctr., *Patent Case Management Judicial Guide* § 5.1.4.3 (3d ed. 2016); *accord Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1360 (Fed. Cir. 2004) (citing *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).  Sometimes, however, the ordinary and customary meaning of claim language to a person of ordinary skill in the art may be identical to the meaning of that language to a lay person who is not skilled in the art.  *See Phillips*, 415 F.3d at 1314 (acknowledging that claim construction sometimes "involves little more than the application of the widely accepted meaning of commonly understood words").  When the meaning of a claim term is clear and there is no genuine dispute as to its scope, a court may decline to issue a construction.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362

---

[3]    Here, Reflex asserts, and DoseLogix does not contest, that a person of skill in the art of the patents-in-suit "is a person with an undergraduate degree in mechanical engineering or equivalent knowledge gained from on-the-job training."  *See* ECF No. 60 at 6; ECF No. 63 at 5.

7

(Fed. Cir. 2008); *Patent Case Management Judicial Guide* § 5.1.4.3 (explaining that construing a term under such circumstances "could well encroach upon the fact-finder's domain"); *see also, e.g.*, *QXMédical, LLC v. Vascular Sols., LLC*, No. 17-cv-1969 (PJS/TNL), 2018 WL 5617568, at *6 (D. Minn. Oct. 30, 2018). Courts depart from the plain and ordinary meaning of a claim term only "when a patentee acts as his own lexicographer" or "when the patentee disavows the full scope of the claim term in the specification or during prosecution." *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016).

"The intrinsic record in a patent case is the primary tool to supply the context for interpretation of disputed claim terms." *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Such intrinsic evidence includes "the words of the claims themselves, the remainder of the specification, [and] the prosecution history," which "consists of the complete record of the proceedings before the [Patent and Trademark Office ('PTO')] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1314, 1317 (citations omitted). The prosecution history of a parent application also constitutes intrinsic evidence that may be useful in construing claim terms. *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp.*, 90 F.3d at 1582).

Courts also may rely on "extrinsic evidence"—that is, "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (citations omitted). Extrinsic evidence "can shed useful light on the relevant art," but it "is less significant than the intrinsic record in determining the legally operative meaning of disputed claim language." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (internal quotation marks and citation omitted); *see Phillips*, 415 F.3d at 1317. Extrinsic evidence is "less reliable" than intrinsic evidence and may not be used to contradict intrinsic evidence. *Phillips*, 415 F.3d at 1318; *see Mantech Env't Corp. v. Hudson Env't Servs., Inc.*, 152 F.3d 1368, 1373 (Fed. Cir. 1998).

IV

Turn to the eight disputed claim terms. These eight terms appear in four independent claims and six dependent claims of the patents-in-suit. The first claim is independent **Claim 7 of the '685 patent**, which provides in its entirety:

> 7.  A dosing dispenser for a flowable composition, the dosing dispenser comprising:
>
> > a housing defining a chamber configured to receive a flowable composition;
> >
> > a plunger movable within the chamber;
> >
> > a traveler at least partially within the chamber and movable within the chamber;
> >
> > a driver at least partially within the chamber, wherein the driver is rotatable relative to the housing and is engaged with the traveler such that rotation of the driver selectively positions the traveler at a predetermined location within the chamber; and

9

at least one arm rotatable with the driver, wherein the at least one arm extends radially outwards from an arm location proximate to the driver and comprises an inner surface, an outer surface, and an end face extending between the inner surface and the outer surface, wherein the inner surface faces inwards and the outer surface faces outwards, and wherein the end face is circumferentially offset from the arm location where the arm extends from the driver when the at least one arm is in a bent configuration and in an un-bent configuration.

'685 Patent at 23:48–24:3.  The next is dependent **Claim 12 of the '685 Patent**, which discloses:

12.  The dosing dispenser of claim 7, wherein the at least one arm comprises a clicking profile and a projection extending from the arm, and wherein the at least one arm is bendable with rotation of the at least one arm such that the at least one arm provides auditory feedback.

*Id*. at 24:26–30.  The third is independent **Claim 1 of the '027 Patent**, along with dependent **Claims 3–8**:

1.  A dosing dispenser comprising:

a housing defining a chamber;

a traveler comprising a first end and a second end opposite from the first end, wherein the traveler is retained within the chamber when the dosing dispenser is assembled such that the first end and the second end are within the chamber;

an anti-back rotation assembly comprising an elongated driver and at least one flexible arm rotatable with the elongated driver, wherein the anti-back rotation assembly is at least partially within the chamber and engaged with the traveler such that rotation of the driver movably positions the traveler within the chamber along an axis,

wherein the at least one flexible arm extends circumferentially in a direction opposite a direction of rotation of the driver, wherein the at least one flexible arm comprises an outer surface facing outwards and

10

an inner surface facing inwards, and wherein, when the dosing dispenser is assembled, the outer surface of the at least one flexible arm is an outermost extent of the anti-back rotation assembly;

a base that is rotatable relative to the housing, and wherein the rotation of the driver is caused by rotation of the base; and

a plunger within the chamber and engageable with the traveler,

wherein, when the dosing dispenser is assembled and the traveler is engaged with the plunger, the plunger is unidirectionally movable by the traveler within the chamber along the axis, and

wherein the traveler is configured to selectively position the plunger at a predetermined location by unidirectionally moving the plunger along the axis so as to dispense a predetermined quantity of a flowable composition from the dosing dispenser.

\* \* \*

3.   The dosing dispenser of claim 1, wherein the plunger comprises a first end and a second end, wherein the first end of the plunger is proximate to a first end of the housing relative to the second end of the plunger, wherein the second end of the plunger defines a plunger cavity, and wherein the first end of the traveler is configured to engage the plunger within the plunger cavity.

4.   The dosing dispenser of claim 1, wherein the traveler is configured to selectively position the plunger at a predetermined location by unidirectionally moving the plunger along the axis, such that the predetermined quantity of the flowable composition is dispensed from the dosing dispenser.

5.   The dosing dispenser of claim 4, wherein the predetermined location is a first predetermined location of a plurality of predetermined locations and the predetermined quantity is a first predetermined quantity, and wherein the traveler is configured to selectively position the plunger at a second predetermined location of the plurality of predetermined locations along the axis within the chamber so as to dispense a second pre-determined quantity of the flowable composition from the dosing dispenser.

6.   The dosing dispenser of claim 1, wherein the base comprises an outer perimeter, and where the at least one flexible arm is within the outer perimeter of the base.

7.   The dosing dispenser of claim 6, wherein the flexible arm is a first flexible arm of a plurality of flexible arms, and wherein the dosing dispenser further comprises a cam operatively connected to the driver and a plurality of slots disposed adjacent the cam, the cam having the plurality of flexible arms, each of the flexible arms including an engagement end configured to engage one of a plurality of slots.

8.   The dosing dispenser of claim 1, wherein a cross-sectional shape of the plunger is substantially similar to a cross-sectional shape of the chamber such that the plunger forms a fluid tight seal with the housing within the chamber as the plunger is movably positioned within the chamber.

'027 Patent at 23:11–24:23.  Finally, independent **Claim 12 of the '027 Patent** discloses:

12.   A dosing dispenser comprising:

a housing defining a chamber and comprising a first dispensing end, a second end, and a sidewall extending from the first dispensing end to the second end;

a traveler comprising a first end and a second end opposite from the first end, wherein the traveler is retained within the chamber when the dosing dispenser is assembled such that the first end and the second end are within the chamber;

a driver at least partially within the chamber and engaged with the traveler such that rotation of the driver movably positions the traveler within the chamber along an axis; and

a plunger engageable with the traveler and movable within the chamber between a dispensed position and a filled position, wherein, in the filled position, the plunger is at a maximum spaced apart distance from the first dispensing end of the housing, and wherein, in the dispensed position, the plunger is at a minimum distance from the first dispensing end,

wherein, when the dosing dispenser is assembled and the traveler is engaged with the plunger, in the dispensed position, at least a portion of the driver is uncovered within the chamber relative to the sidewall of the housing.

'027 Patent at 24:40–64.  The at-issue terms from these claims will be addressed in turn.

A

**"dosing dispenser"**

The term "dosing dispenser" appears in Claims 1, 3–8, and 12 of the '027 Patent and Claims 7 and 12 of the '685 Patent. The Parties agree that this term should be construed according to its ordinary meaning, yet they dispute that ordinary meaning. DoseLogix says the meaning is a "dispenser for dispensing a measured dose." ECF No. 61 at 3.[4] Reflex, on the other hand, argues that the term should be defined by its ordinary meaning and needs no further construction for two reasons: (1) "dosing dispenser" is a generic term used in its ordinary sense; and (2) the term is readily understood by a person of skill in the art. ECF No. 60 at 7.

This term is easily understood by its plain and ordinary meaning and requires no further construction. To the extent DoseLogix proposes that the term be construed as a "dispenser for dispensing a . . . dose," DoseLogix essentially just restates the phrase "dosing dispenser," but with extra, unnecessary words. What remains to be decided hinges on whether there is evidentiary support for the dispenser's dose to be a "*measured*" one. Use of the word "dosing" in the claim language inherently implies that a certain, measured amount or quantity is being delivered. This understanding is consistent with the intrinsic

---

[4]     Initially, DoseLogix proposed that "dosing dispenser" be construed as a "dispenser for dispensing a measured dose *of medicament*." ECF No. 58 at 8 (emphasis added). In response to Reflex's opening *Markman* brief, DoseLogix agreed to remove "of medicament" from its proposed construction of this term. ECF No. 61 at 3. As a result, Reflex's response to that portion of DoseLogix's proposed construction no longer requires consideration. *See* ECF No. 60 at 7 (challenging DoseLogix's construction to the extent that it included a field of use limitation to doses of medicaments or medicines).

evidence, and Reflex does not challenge it.[5]  Independent Claim 1 of the '027 Patent itself discloses a "predetermined quantity of a flowable composition" dispensed from the dosing dispenser.  *See* '027 Patent at 23:46–47.  And the specification describes how the patent generally seeks to solve the challenge of providing "an accurate measured dose" when "[a]dministering . . . cream-based medicines," especially in older patients who have vision challenges or lack dexterity. '685 Patent at 1:30–43.  Before describing the various embodiments, the specification further states that:

> [t]o ensure that the dispenser *provides an accurate dosage*, the patient may be consistently alerted to stop rotation of the drive screw at the appropriate location, and *the amount of medicine that is pushed through a dispensing end may not vary* due to leaks or fluctuation in the movement of the plunger.

*See id*. at 6:4–10 (emphasis added); *see also id*. at 16:23–57 (describing how the device provides a "predetermined amount of flowable composition," such as where "the prescription might be for 1 cc of flowable composition" per dose).  The term "dosing dispenser" is easily understood by its plain and ordinary meaning, which inherently implies dispensing a measured dose, and no further construction will issue.

B

**"flowable composition"**

The Parties dispute the meaning of the term "flowable composition," which appears in Claims 1, 4, and 5 of the '027 Patent and Claim 7 of the '685 Patent.  In briefing, the dispute over this term's construction centered on the word "flowable."  *See*  ECF No. 58 at

---

[5]      Upon the Court's questioning at the *Markman* hearing, Reflex admitted that the term "dose" implies a measured amount.

9–10.  But at the *Markman* hearing, Reflex posited that the "composition" aspect of this term also may require definition to be understandable by a jury, even more so than the term "flowable."  Both parts of the claim will be addressed.

DoseLogix asserts that "flowable composition" should be construed as "composition capable of movement by flowing."  *Id*.  DoseLogix admits that it seeks to narrow the scope of "flowable composition" in an effort to distinguish Reflex's prior art references covering lip balm and lipstick dispensers.  ECF No. 58 at 10; *see also* ECF No. 63 at 7.  Yet DoseLogix offers no explanation as to how a prior art reference cited by *Reflex* informs the meaning of a claim in *DoseLogix's* patent.  Essentially, DoseLogix appears to be asking the Court to frame the claim construction so that it will win on an invalidity analysis that is not currently before the Court.  Reflex disagrees with DoseLogix's construction but does not offer any argument or evidence to support its position—it just says that DoseLogix is wrong.  *See* ECF No. 60 at 8; ECF No. 63 at 7.  At the *Markman* hearing, Reflex suggested that the "composition" aspect of this term may really be what needs construction.  Reflex stated that it does not intend to take the position that lipstick or lip balm is a "flowable composition" and agreed that a "composition" is essentially a compound or its equivalent.

With these arguments in mind, turn to the intrinsic evidence.  The specification states:

> The flowable composition may include but is not limited to creams or semi-solid emulsions such as oil-in-water creams and water-in-oil creams, gels,

sols,[6] colloids, suspensions, solutions, liquids with positive viscosity such as syrups, or other suitable flowable compositions or medicaments.

'685 Patent at 6:12–17.  The specification also states that "during use of the dispenser 10, the flowable composition may flow into or out of the chamber 108 through the dispensing aperture 110."  *Id*. at 6:40–42.  Though DoseLogix seeks to impart "movement" on the flowable composition, it points to nothing in the specification that requires such movement.  The intrinsic evidence thus supports a construction consistent with the term's ordinary meaning—"capable of flowing or being flowed."  *See* Flowable, *Merriam-Webster's Unabridged Dictionary*, Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/flowable (last visited Nov. 10, 2022).  And to the extent the meaning of the term "composition" was raised at the *Markman* hearing, the specification provides the boundaries for the types of compositions or compounds that are explicitly contemplated in the specification.  *See* '685 Patent at 6:12–17.  Because this term is easily understood by its plain and ordinary meaning that is consistent with the claim language, no construction will issue.

---

[6]      A "sol" is "a fluid colloidal system; especially: one in which the dispersion medium is a liquid."  Sol, *Merriam-Webster's Medical Dictionary*, Merriam-Webster, https://unabridged.merriam-webster.com/medical/sol (last visited Nov. 10, 2022); *see also* sol, n.6: Oxford English Dictionary (oed.com) (last visited Nov. 10, 2022) (defining "sol" as "*Physical Chemistry*.  A liquid solution or suspension of a colloid.").

C

**"driver"**

The construction of the term "driver," which appears in Claims 1, 7, and 12 of the '027 Patent and Claim 7 of the '685 Patent, is a source of significant dispute between the Parties. DoseLogix argues that no construction is needed for the term, and it should carry its plain and ordinary meaning. ECF No. 58 at 11. If claim construction is needed, DoseLogix argues that "driver" should be construed consistent with its dictionary definition, as "a component of a mechanism that transmits motion to other components." *Id.*; ECF No. 59 Exs. K, L. Reflex, on the other hand, argues that "driver" should be construed narrowly as the "drive screw" described in the specification. ECF No. 63 at 8.

The term "driver," used alone, appears in the Abstract and the claims of the patents-at-issue. The Abstract describes the "driver" generically, in line with the plain and ordinary meaning of the word. The Abstract provides, in relevant part:

> A dosing dispenser for a flowable composition includes a housing, a traveler, a plunger, and a driver. . . . The driver is at least partially within the chamber and configured to movably position the traveler relative to the driver. The driver is engaged with the traveler within the chamber.

'685 Patent (Abstract). The Court may consider the Abstract to determine the scope of the invention. *Hill-Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.1 (Fed. Cir. 2000). Here, the Abstract uses the term consistent with the claim language and its plain and ordinary meaning.

Reflex argues that the only other "driver" described in the specification is a "drive screw," and thus "driver" should be construed as just that. Reflex points to how the term

is used in the rest of the specification—in particular, that "*driver screw*" appears once in the patent (describing Figure 17), '685 Patent at 4:14–16, and "*plunger driver*" 19 times. But the term "drive screw," often referring to "drive screw 400" appears 83 times in the patent specification, and often describes a "drive screw" that is "engaged with the traveler" to move the traveler within the chamber. For instance, the Summary of the Invention describes:

> In certain examples, a base assembly is configured to movably position the traveler within the chamber. In some aspects, the base assembly includes a base, a *drive screw* threadably engaged with the traveler and coupled to the base such that rotation of the base rotates the *drive screw* and axially moves the traveler within the chamber, a base support rotatably supporting the *drive screw* and the base, the base support including a mounting portion and a supporting portion, the supporting portion including at least one notch, and a cam mounted on the *drive screw* and including at least one extension configured to engage the at least one notch as the cam is rotated through the *drive screw*. In various aspects, a cross-sectional shape of the plunger is substantially similar to a cross-sectional shape of the chamber such that the plunger forms a fluid tight seal with the housing within the chamber as the plunger is movably positioned within the chamber.

'685 Patent at 2:51–67 (emphasis added). The specification further describes:

> As illustrated in FIG. 4, the drive screw 400 includes a body 402 having a first end 404, a second end 406, and a support collar 410 between the first end 404 and the second end 406. In various cases, the body 402 includes threading 408 between the first end 404 and the support collar 410 that are configured to threadably engage the threading 310 of the traveler 300 such that rotation of the drive screw 400 axially moves the traveler 300 along the body 402. In various cases, at least a portion of the body 402 between support collar 410 and the second end 406 is a key 412 having a key profile that is configured to engage the base 700 such that rotation of the base 700 rotates the drive screw 400, as described in detail below.

*Id.* at 8:65–9:10.5  There appears to be no dispute that the specification's "drive screw" is a type of driver, in that it imparts motion or axial force on the traveler.   The dispute is about whether a driver should be defined narrowly, and only as a drive screw.

Reflex's arguments are unpersuasive in this regard.   Driver is a common term, the ordinary meaning of which is easily understood by both a person of skill in the art or an unskilled lay person.   Relevant to this context, dictionaries define "driver" as "a part that transmits force or motion," or "a mechanical piece for imparting motion to another piece." *See Driver*, Dictionary.com, https://www.dictionary.com/browse/driver (last visited Nov. 9, 2022); *Driver*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/driver (last visited Nov. 9, 2022).   The "driver" term should not be confined to the embodiments described in the specification—even if the specification describes only a single embodiment.   The Federal Circuit has explained that "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323.   And the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id*.   This is because "the claims themselves set forth the limits of the patent grant," and also because "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id*.   Moreover, the specification makes clear that the disclosed drive-screw embodiments are exemplary and do not limit the scope of the claims. *See* '685 Patent at 22:55–23:7 ("The above-described aspects are merely possible examples of

implementations, merely set forth for a clear understanding of the principles in the present disclosure . . . [and] although specific terms are employed herein, as well as in the claims which follow, they are used only in a generic and descriptive sense, and not for the purposes of limiting the described invention, nor the claims which follow.").

Reflex's argument that DoseLogix limited the claim "driver" to a "drive screw" during the prosecution history is also unpersuasive. Reflex explains that in an interview with the patent examiner after the utility application claiming priority to the DoseLogix provisional was filed, the applicant confirmed that "the driver recited in claim 24 is referring to the element identified by reference numeral 400 in the specification and drawings," distinguishing it from the plunger driver 314. After this, the examiner agreed that claim 24 was "allowable over Jiminez." *See* ECF No. 63 at 9–11 (citing Examiner-Initiated Interview Summ. dated 11 January 2021, File History for Appl. 16/807,154 at 19 [ECF No. 20 Ex. G]). The summary of this interview was captured in the prosecution history as follows:

Date of Interview: <u>11 January 2021</u>

Claims Discussed: 1, 9, and 24

Prior Art Discussed: Jimenez and Wojcik

Brief Description of the main topic(s) of discussion: Examiner contacted applicant to clarify the correct interpretation of the driver recited in claim 24 and to notify the applicant of allowable subject matter in claim 9.

---

Issues Discussed:

Item(s) under 35 U.S.C. 103:
Examiner noted that Wojcik teaches a plunger comprising a rib (28). Applicant agreed to cancel claims 1-8 to place the application in condition for allowance.

Claim Interpretation and/or scope:
Since applicant's specification includes descriptions of more than one driver (400 and 314), examiner sought clarification on the correct interpretation of the driver recited in claim 24. Applicant noted that the driver recited in claim 24 is referring to the element identified by reference numeral 400 in the specification and drawings. Examiner agreed that claim 24 is allowable over Jimenez.

*See id.* at 11.  Based on the limited context provided, this exchange does not indicate a "clear and unmistakable statement[] of disavowal" during prosecution.  *See Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1358 (Fed. Cir. 2003); *Omega Eng'g v. Raytek Corp.*, 334 F.3d 1314, 1324–26 (Fed. Cir. 2003).  The applicant's response refers only to one claim of many that use the term "driver," and the comments do not "clear[ly] and unmistakabl[y]" disavow other meanings of the term.

Finally, Reflex's indefiniteness argument is also unpersuasive.  The Federal Circuit applies a "rule that disclosure of a species may be sufficient written description support for a later[-]claimed genus including that species." *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1124 (Fed. Cir. 2004).  The exception to this rule occurs in cases where there is "unpredictability in the particular field," which "may warrant closer scrutiny of whether disclosure of a species is sufficient to describe a genus." *Id.* at 1125.  The patent claims here involve a relatively simple, straightforward term—a driver—in a predictable mechanical field, where "the person skilled in the art *would* . . . readily discern that other members of the genus would perform similarly to the disclosed members [of the species]." *Id.*; *see also Am. Med. Sys., Inc. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 914 (D. Minn. 2010) ("If an invention pertains to an art where the results are predictable, *e.g.*, mechanical as opposed to chemical arts, a broad claim can be enabled by disclosure of a single embodiment.") (citing *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1533 (Fed. Cir. 1987)).  No evidence has been cited suggesting that a person of ordinary skill in the art would have understood "driver" any differently from its everyday definition, and the term "driver" thus requires no construction.

D

**"traveler"**

The Parties dispute the meaning of the term "traveler" as used in claims 1, 3, 4, and 12 of the '027 Patent and claim 7 of the '685 Patent. DoseLogix asserts that the term carries its ordinary meaning and thus needs no additional construction. ECF No. 58 at 14–15. If construction is needed, DoseLogix argues that the term should be construed as "a component of a mechanism that moves in a fixed course." *Id*. Reflex asserts that "traveler" should be construed only as it is used in the specification, as a "drive nut (with internal threads)." ECF No. 63 at 16–17. But Reflex provides no basis for its assertion that the traveler is not "anything other than a nut with internal threads." *See* ECF No. 63 at 16.[7]

"Traveler" is a commonly understood term that generally means something that travels within a region of space. Like the term "driver," traveler is understood by its ordinary meaning which is consistent with the claim language. This term needs no construction.

---

[7]    Alternatively, Reflex argues that the term is indefinite "for the same reason that a broad interpretation of 'driver' would render the claims indefinite" or that "to the extent that DoseLogix alleges that the term 'traveler' also covers a screw, the term 'traveler' is indefinite." ECF No. 60 at 12. There appears to be no need to address this undeveloped argument, especially as the patent is precise enough to give clear notice of what is claimed. *See Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 901 (2014); *see also Red Rhino Leak Detection, Inc. v. Anderson Mfg. Co.*, No. 17-cv-2189 (ECT/DTS), 2019 WL 4039972, at *10 (D. Minn. Aug. 27, 2019).

E

**"traveler is retained within the chamber when the dosing dispenser is assembled such that the first end and second end are within the chamber"**

The Parties dispute the meaning of the phrase "traveler is retained within the chamber when the dosing dispenser is assembled such that the first end and second end are within the chamber," which appears in Claims 1 and 12 of the '027 Patent.  The phrase "retained within" is at the heart of this dispute, in particular regarding *when* and *for how long* the traveler is "retained within" the chamber.  DoseLogix argues that the term should be construed as the "traveler is kept inside the chamber *at all times* when the dosing dispenser is assembled."  ECF No. 58 at 15–18 (emphasis added).  Reflex, on the other hand, argues that this term is understood by its ordinary meaning and thus does not need construction.  If construction is needed, Reflex argues that the term should be construed as "the components of the dosing dispenser may be assembled such that the first and second ends of the traveler are in the chamber."  *See* ECF No. 63 at 17.

In support of its construction, DoseLogix first argues that a patent listed in Reflex's Prior Art Statement[8] informs the meaning of this phrase as it appears in the claims of the '027 Patent.  Specifically, DoseLogix points to the term as used in U.S. Patent No. 5,851,079 (the "'079 Patent") in Defendant's Prior Art Statement and attempts to distinguish DoseLogix's usage of the term "retained within" from one of the figures in that patent.  ECF No. 58 at 16.  Yet DoseLogix offers no explanation why it would make legal

---

[8]     DoseLogix does not provide a docket citation to Reflex's Prior Art Statement, and it was not found on the docket.  *See* ECF No. 58 at 15–16.

sense to look to the '079 Patent to inform the meaning of claims in the '027 Patent—the '079 Patent does not appear as a cited reference in the '027 Patent, and there is no argument or evidence that the inventor distinguished the '079 Patent during prosecution in order to obtain an allowance.

DoseLogix next references the doctrine of claim differentiation, arguing that there should be a difference between how the traveler is "retained within the chamber" as used in Claims 1 and 12 of the '027 Patent, as compared to Claim 7 of the '685 Patent, where the traveler is "*at least partially* within the chamber." *See* '685 Patent at 23:53–54. True, "[t]he doctrine of claim differentiation 'create[s] a presumption that each claim in a patent has a different scope.'" *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) (quoting *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998)). But the Federal Circuit has cautioned that "the doctrine of claim differentiation is not as strong across related patents as it would be if the different claim limitations appeared in the same patent." *Clare v. Chrysler Grp. LLC*, 819 F.3d 1323, 1330 (Fed. Cir. 2016). Even considering that doctrine here, DoseLogix's claim differentiation argument is problematic because Claim 7's "traveler . . . within the chamber" does not share the same contextual language of "when the dosing dispenser is assembled" as in the '027 Patent. Read in context, Claim 7 discloses: "a traveler at least partially within the chamber and moveable within the chamber." '685 Patent at 23:53–54. But Claim 7 does not disclose *when* the traveler is "at least partially within the chamber" or "moveable within the chamber." In contrast, Claims 1 and 12 of the '027 Patent disclose "a traveler . . . retained within the chamber when the dosing dispenser is assembled." '027 Patent at 23:14–18,

24

24:44–48.  Accordingly, even if one may differentiate a traveler that is "partially within the chamber" (Claim 7) from a traveler that is "retained within the chamber" (Claims 1 & 12), the term as used in the context of Claim 7 does not resolve the timing-related claim-construction dispute.

Finally, DoseLogix points to extrinsic evidence.  DoseLogix's proposed dictionary meaning—that "retained within" means "kept within"—really lends nothing further to the definition than the plain and ordinary meaning of the phrase "retained within" as it is used in the claim.  The plain and ordinary meaning of this term makes clear that when the dosing dispenser is assembled, the traveler is retained within the chamber, such that both ends of the traveler are within the chamber.  This term needs no further construction.

F

**"anti-back rotation assembly"**

The term "anti-back rotation assembly" appears in Claim 1 of the '027 Patent.  The Parties' dispute centers on the meaning of "anti-back rotation," and whether the components must *prevent*, or merely *resist*, backward rotation.  DoseLogix argues that this term should be construed as "dosing dispenser parts that are operable to resist backward rotation."  ECF No. 58 at 17.  Reflex, on the other hand, contends that this term should be construed as "cooperating components that allow rotation in a single direction."  *See* ECF No. 60 at 13, ECF No. 63 at 18.  In other words, Reflex maintains that the anti-back rotation assembly prevents rotation in all but one direction.  Reflex has withdrawn its alternative argument that the term "anti-back rotation assembly" as used in Claim 1 of the '027 Patent is indefinite because of arguments made in the prosecution history.  *See* ECF No. 63 at 18.

25

The patent specification addresses the anti-back rotation assembly when referring to Figure 11:



FIG. 11

The specification explains:

> In some cases, the trailing edge 612 is configured to engage the supporting portion 512 when the projection 610 is within one of the slots 522 to prevent rotation of the cam 600 in the direction of the trailing edge 612. The trailing edge 612 may have various suitable profiles and geometries that provide an interface that resists rotation of the cam 600 in the direction of the trailing edge 612 when the projections 610 are within the slots 522. In some cases, the trailing edge 612 may have a profile that engages the supporting portion 512 such that the arms 606 of the cam 600 will break before allowing back rotation.

'027 Patent at 10:22–33.   The specification further provides:

> The design of the present invention substantially prevents reverse rotation of the base 700 with respect to the housing 100 so that flowable composition 1000 is not inadvertently sucked back into the dispenser 10, which may reduce the effective dosage dispensed and may contaminate the flowable composition 1000 in the chamber 108.

*Id.* at 16:44–50.

Based on the limited record concerning this issue, DoseLogix has the better answer. The anti-back rotation assembly resists (but does not necessarily completely prevent) backward rotation. The specification provides that the interface "resists rotation of the

26

cam," that "[i]n some cases . . . the arms [] of the cam [] will break before allowing back rotation," and that the "design . . . substantially prevents reverse rotation of the base." '027 Patent at 10:21–33, 16:44–52.  The anti-back rotation assembly thus does not entirely prevent backward rotation—if you apply enough force you will break it, strip it, or turn it backwards.  Consistent with the intrinsic evidence, "anti-back rotation assembly" will be construed as "parts that are operable to resist backward rotation."

G

**"traveler is configured to selectively position the plunger at a predetermined location . . . so as to dispense a predetermined quantity of a flowable composition"**

The disputed term "traveler is configured to selectively position the plunger at a predetermined location . . . so as to dispense a predetermined quantity of a flowable composition" appears in Claim 1 of the '027 Patent.  Reflex argues that the ordinary meaning of the term should apply, but alternatively, that because the "predetermined location" limitation is not used in the specification of the patent, this renders the term indefinite.  ECF No. 63 at 19–20.  Without explanation or citation, Reflex goes on to state that "[t]his lack of disclosure also means that the earliest effective priority date of all claims with the limitation 'predetermined' is December 27, 2017."  *See* ECF No. 60 at 15–16; ECF No. 63 at 19–20. DoseLogix, on the other hand, argues that the term should be construed as the "[t]raveler is configured to position the plunger at locations[9] that are preset prior to use to dispense preset quantities of the flowable composition, wherein the locations

---

[9]     DoseLogix's construction initially included the phrase "traveler is configured to position the plunger at *specific* locations . . . ," but agreed to remove the word "specific" from its proposed construction in its response brief.  *See* ECF No. 61 at 11.

and quantities are not altered or changed by the functioning of the dispenser." ECF No. 58

at 19; ECF No. 61 at 11. DoseLogix goes on to explain that "the locations and quantities

are not altered by the functioning of the dispenser during use—again, they are preset prior

to use." *Id*. DoseLogix points to the following intrinsic support for its construction:

> As illustrated in FIGS. 8–10 and 12, the supporting portion 512 defines
> notches or slots 522 that are configured to engage arms 606 of the cam 600,
> as described in detail below. . . . The slots 522 define one or more home or
> "click" positions that are provided at predetermined intervals on the
> supporting portion 512. The intervals of the slots 522 may correspond with a
> predefined amount of flowable composition is dispensed from the
> dispenser 10 upon rotation of the drive screw 400 between successive home
> positions, as described in detail below.

'685 Patent at 9:57–10:1. Further, the specification provides:

> With each click, a predetermined amount of flowable composition 1000 is
> forced by the rising plunger 200 to be dispensed through the applicator 900.
> . . . The tactile and audible click heard as the base 700 is rotated provides
> feedback as to how much flowable composition 1000 is dispensed. For
> example, the prescription might be for 1 cc of flowable composition 1000 per
> dose to be applied to the skin. If each click is 0.25 cc, for example, then the
> prescription might instruct the user to turn the base 700 to hear four clicks so
> as to dispense 1 cc of flowable composition 1000.

'685 Patent at 16:23–25, 34–41. Finally, the specification provides:

> In certain embodiments, the indicator may be a visual indicator, such as ruler
> with a set of marks along the side of the housing 100, with each mark being
> correlated to a particular quantity of flowable composition 1000 remaining
> in the dispenser 10. . . . As one non-limiting example, FIG. 18 illustrates the
> dispenser     with     a     visual     indicator 101 wherein     the     visual
> indicator 101 includes at least one mark. In certain examples, the visual
> indicator 101 may provide a visual indication for home or "click" positions.

'685 Patent at 17:3–16. Based on the specification, DoseLogix argues that the "dispenser

is preset prior to use to dispense specific quantities of a flowable composition by

positioning the plunger at specific locations that are determined prior to use," and that its

construction "explains that the locations and quantities are not altered by the functioning of the dispenser during use"—rather, "they are preset prior to use."  ECF No. 61 at 12. DoseLogix further maintains that the claim is not indefinite because, based on the above specification excerpts, "the patents include extensive disclosure concerning predetermined locations, including specific examples of predetermined locations."  *Id.* at 13.

It appears that much of the Parties' dispute thus centers on the "predetermined" aspect of the at-issue claim term.  Here, "predetermined" has a commonly understood meaning that is consistent with the claim language—that is, something that is determined beforehand.  *See, e.g., Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1375–76 (Fed. Cir. 2017) ("[I]t is undisputed that the plain meaning of 'predetermined' is to determine beforehand."); *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1340 (Fed. Cir. 2003) ("The ordinary meaning of 'predetermine' is 'to determine beforehand.'" (citing *Webster's Third New International Dictionary* 1786 (1966)); *Rail Assets, LLC v. Wabtec Corp.*, 2:19-cv-1636 NR, 2021 WL 702434, at *6 (W.D. Pa. Feb. 23, 2021) (construing "predetermined time window" as "a fixed duration of time that is determined beforehand, within which certain events must occur relative to one another").  This bears out in the specification, which describes embodiments that portion and dispense "predefined" or "predetermined" amounts of the flowable composition, and use a "ruler with a set of marks along the side of the housing . . ., with each mark being correlated to a particular quantity of flowable composition . . . remaining in the dispenser."

Though both Parties essentially seem to agree on as much, DoseLogix goes too far with its addition of the language "wherein the locations and quantities are not altered or changed by the functioning of the dispenser."  DoseLogix points to nothing in the '027 Patent to support this aspect of its proposed construction, and it makes no sense when read in context.  In particular, as described in the specification, as the dispenser dispenses a dose, the location of the plunger changes, and the quantity of flowable composition changes (or is reduced, until it ultimately bottoms out).  Thus, contrary to DoseLogix's position, both the location of the plunger and the quantity of the flowable composition *are* altered by the functioning of the dispenser.  This understanding is informed by the specification, which makes clear that the traveler and the plunger—both of which appear in this claim limitation—move.  Claim 1 itself discloses that "the plunger is unidirectionally movable by the traveler within the chamber along the axis."  '027 Patent at 23:39–42; *see also* Abstract ("the plunger is movable within the chamber" and "[t]he driver is . . . configured to *movably position the traveler* relative to the driver" (emphasis added)).   The plunger and traveler move along as the flowable composition is dispensed.  Thus, that portion of DoseLogix's construction which states "wherein the locations and quantities are not altered or changed by the functioning of the dispenser" is unsupported.  What is left of DoseLogix's proposed construction is just a re-stating of the ordinarily understood meaning of the claim terms.  Because this claim term has a commonly understood meaning that is consistent with the claim language and the specification, no construction will issue.

Finally, Reflex's indefiniteness argument is not persuasive.  The United States Supreme Court has held that a claim is invalid for indefiniteness if "its claims, read in light

of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 901 (2014); *see also Niazi Licensing Corp. v. St. Jude Med. S.C., Inc*., 30 F.4th 1339, 1346 (Fed. Cir. 2022).  Reflex offers no support for its indefiniteness argument, and the at-issue claim language—read in light of the specification—would reasonably inform those of skill in the art about the scope of the invention.

H

**"arm extends . . . from an arm location proximate the driver"**

The term "arm extends . . . from an arm location proximate the driver" appears in Claim 7 of the '685 Patent.  DoseLogix argues that this term should be construed as "arm extends from a location very near or immediately adjacent the driver."  ECF No. 58 at 24–26.  In support, DoseLogix points to the following portion of the specification:

> Referring to FIG. 11, the cam 600 includes a body 602 that defines a keyhole 604. The keyhole 604 has a shape that is complimentary to the key 412 of the drive screw 400 such that the key 412 is insertable through the keyhole 604, and rotation of the drive screw 400 rotates the cam 600. As illustrated in FIGS. 11 and 12, the cam 600 includes at least one arm 606. In the present example, the cam 600 includes three arms 606. Some or all of the arms 606 may have the same engagement end 608, or each arm 606 may have a different engagement end 608, depending on the purpose of each arm 606. In various cases, the cam 600 may include the same number of arms 606 as the number of slots 522 of the base support 500.

'685 Patent at 10:5–17.  Figures 11 and 12 show:



FIG. 11                              FIG. 12

Reflex, on the other hand, maintains that this term can be understood by its ordinary meaning and thus requires no additional construction.  ECF No. 60 at 17–18; ECF No. 63 at 21.

Because the '685 Patent does not explicitly define the term "proximate" as to the position of the arm to the driver, the term "proximate" carries its plain and ordinary meaning, which is "near or close to."  *See Boehringer Ingelheim Pharms., Inc. v. Lupin Atlantis Holdings SA*, No. 3:18-cv-12663-BRM-TJB, 2020 WL 1888247, at *5–*6 (D. N.J. Apr. 16, 2020) (citing *Philips*, 415 F.3d at 1313) (construing "proximate to" according to "its plain and ordinary meaning, which is "near or close to") & n.5 (citing cases).  That said, DoseLogix's proposed construction goes a little too far.  There is no evidentiary support for adding additional qualifiers to the construction—*i.e.*, that the term be construed to mean "*very* near or *immediately* adjacent"—and such qualifiers would confuse, rather than aid, the jury in its infringement analysis.  For these reasons, the term will be construed according to its ordinary meaning—namely, that "the arm extends . . . from an arm location near or close to the driver."

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      The terms of U.S. Patent Nos. 10,947,027 and 10,919,685 be construed as set forth above.

2.      Plaintiff's motion for leave to file a reply to Defendant's response brief [ECF No. 64] is **DENIED AS MOOT**.

3.       Defendant's motion for leave to file a reply/surreply *Markman* brief [ECF No. 67] is **DENIED AS MOOT**.


Dated:  November 10, 2022            s/ Eric C. Tostrud
                                     Eric C. Tostrud
                                     United States District Court